**In re EXCESS VALUE INSURANCE COVERAGE LITIGATION.**

**This Document Relates To: All Actions.**

**No. M–21–84(RMB) (MDL–1339).**

United States District Court, S.D. New York.

Nov. 3, 2005.

### ORDER DETERMINING COUNSEL FEES

RICHARD M. BERMAN, District Judge.

Recognizing that percentage of funds is the preferred method of assessing fees in a settlement like this, with lodestar analysis providing only a check, I can effectively gauge appropriate attorney fees only if I know the total value of the settlement. But although I am satisfied that the coupon settlement has value to the class, I am not confident of the redemption rate that has been projected and thus of the settlement's total value. Therefore, I have determined to delay award of attorney fees until experience shows how many vouchers are exercised and thus how valuable the settlement really is.

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 292 F.Supp.2d 184, 189–90 (D.Me.2003) (Hornby, D.J.) (citation omitted).

### I. Background

This consolidated multidistrict litigation was brought against United Parcel Service, Inc. ("UPS") and related defendants (together, "Defendants") by purchasers of "excess value" shipping insurance offered by UPS ("Plaintiffs" or the "Class" or "Class Members").[1] On April 20, 2004, Plaintiffs moved (1) pursuant to Rule 23(e) of the Federal Rules of Civil Procedure ("Fed. R. Civ.P.") for final approval of

---

1. The Court assumes familiarity with the factual and procedural history of this case, as set forth in its prior decisions. *See, e.g., In re EVIC Class Action Litig.*, 2004 WL 1724980 (S.D.N.Y. July 30, 2004) (approving settlement and deferring consideration of counsels' fee applications); *In re EVIC Class Action Litig.*, 2002 WL 1766554 (S.D.N.Y. July 31, 2002) (granting in part and denying in part Defendants' motion to dismiss); *Stein Jewelry Co. v. United Parcel Service, Inc.*, 228 F.Supp.2d 304 (S.D.N.Y.2002) (granting in part and denying in part Defendants' motion to dismiss related actions).

settlement of this action as (originally) proposed on December 31, 2003 ("Settlement"); (2) pursuant to Fed R. Civ. P. 23(h) and 54(d)(2) for an award of attorneys' fees and expenses to Plaintiffs' counsel ("Class Counsel") in the amount of $19,340,000.00 ("Class Counsel's Fee Application") to be shared among up to 42 (sets of) attorneys; and (3) for an award of $5,000 to each of 32 Class representatives ("Class Representatives") or a total of $160,000 in incentive compensation ("Incentive Compensation"). (*See* Plaintiffs' Memorandum in Support of the Joint Application of Plaintiffs' Counsel for an Award of Attorneys' Fees, Reimbursement of Expenses and an Award of Incentive Compensation to the Class Representatives, dated April 20, 2004 ("Pl. Fee Mem.").) Defendants "agreed to pay the [Class Counsel's Attorneys' Fees and Expenses] separately from [Defendants'] agreement to provide valuable vouchers" ("Voucher Program") and other relief to UPS customers under the Settlement. (*Id.* at 5.)[2] Defendants did not oppose Class Counsel's Fee Application or the Class Representatives' Incentive Compensation. (*See* Settlement § V(D)(1) ("Defendants will not oppose an award of total Attorneys' Fees equal to or less than" $19,340,000).)

At the Court's request, Plaintiffs filed supplemental papers in which Class Counsel documented a "lodestar" of $6,944,964.00 along with $1,066,403.60 in expenses through May 21, 2004, for total lodestar and expenses of $8,011,367.60. (*See* Order, dated May 5, 2004; Declaration of Stanley M. Chesley, dated May 6, 2004 ("Chesley 5/6/04 Decl.").) By order,

dated May 27, 2004, the Court referred Class Counsel's Fee Application to Magistrate Judge Kevin N. Fox for a report and recommendation to "(1) determine Plaintiffs' attorneys' actual and reasonable 'lodestar'... and (2) determine the actual and reasonable expenses incurred by Plaintiffs' attorneys." (Order, dated May 27, 2004.)

Separate fee applications have (also) been submitted by counsel to certain Class Members who filed objections to the Settlement and Class Counsel's Fee Application ("Objectors"), including counsel for Stainless Systems Corp. ("Stainless Systems"), who seeks an award of $183,100 in attorneys' fees and $2,084.27 in costs (Memorandum in Support of Motion for Award of Attorneys' Fees and Costs to Counsel for Stainless Systems Corp., dated July 5, 2004 ("Stainless Fee Mem.")), and counsel for Objectors Reller, Inc., Meredith Whittington, Jeanine M. Schweinberg, Ann Reid Warrington, William McGrath, Paul Redd, John P. Hale, Jr., Sound Deals, Inc., Digital Playroom, Inc., Kearney D. Hutsler, P.C., Joel Shapiro, and Transnational News Co., Inc. (the "Coordinated Objectors"),[3] who seek an award of attorneys' fees and expenses in the amount of $500,000, from which the Coordinated Objectors collectively seek to be paid an "incentive award" of $1,000 (Petition For An Award of Attorney's Fees and Expenses By Coordinated Objectors' Counsel, dated July 9, 2004 ("Coord. Obj. Fee Mem."), at 8) (together, the "Objectors' Counsel's Fee Applications"). By an agreement, dated July 1, 2004, among Objectors' Counsel, Class Counsel, and Defendants, it was agreed, among other things, that: (1)

---

**2.** "[I]t is appropriate to treat this case as a constructive common fund despite the fact that the fees in the instant action are to be paid by defendants and despite the existence in this Settlement Agreement of a clear sailing provision." *In re Vitamins Antitrust Litig.,*

No. 99–197, MDL 1285, 2001 WL 34312839, at *9 (D.D.C. July 16, 2001).

**3.** Stainless System's counsel and the Coordinated Objectors' counsel are referred to as "Objectors' Counsel."

Class Counsel would reduce their application for expenses by $204,975.39; and (2) the parties would "not oppose.... Objectors['] request for reasonable fees and expenses, not to exceed $600,000," which amount would be drawn from Class Counsel's Fees. (Confidential Term Sheet, Executed July 1, 2004 ("Objector Settlement"), ¶¶ 1, 2, 4; Fourth Joint Addendum to the Stipulation of Settlement, dated July 14, 2004.)

On July 30, 2004, the Court issued a Decision and Order ("Settlement Order") approving the Settlement and deferring (without prejudice) consideration of Class Counsel's Fee Application, the motion for Class Representatives' Incentive Compensation, and Objectors' Counsel's Fee Applications. See Settlement Order, 2004 WL 1724980. The Court determined that Class Counsel's fees could not properly be assessed under either the "lodestar" or "percentage" methods until (1) Judge Fox issued his report regarding Class Counsel's lodestar and expenses, and (2) the Court "determin[ed] the Settlement's actual benefit to the Class" (which "cannot accurately be assessed until the rate at which Class Members redeem UPS Vouchers is known"). (Id. at *15–16.) The Court also held that it could not determine Objectors' Counsel's Fee Applications, "as they are predicated (contingent), in part, upon a final determination of Class Counsel's Fees." (Id. at *17.)

On November 29, 2004, Judge Fox issued a thoughtful and comprehensive report and recommendation ("Report") recommending that Class Counsel's collective lodestar be reduced from $6,944,964.00 to $5,652,271.36 and that Class Counsel's expense award be reduced from $1,066,403.60 to $753,144.25.[4] (See Report at 1.) On December 16, 2004, Class Counsel filed objections to the Report. (See Plaintiffs' Counsels' Combined Response to Magistrate's Report and Recommendation Concerning Lodestar and Expenses, dated December 16, 2004 ("Class Counsel Response to R & R").)

At the Court's request, on September 9, 2005, Plaintiffs and Defendants submitted a Joint Report Relating to Conclusion of Voucher Redemptions ("Joint Report") stating that all UPS Settlement Vouchers had expired, and that "the value of goods and services for which Vouchers were redeemed totaled $4,863,877." (Joint Report ¶ 4 (emphasis added).) This amount contrasts sharply with Class Counsel's earlier estimates of the value of the Voucher Program. (See Affidavit of Plaintiffs' economic expert, Harvey S. Rosen, dated April 20, 2004 ("Rosen Aff."), ¶ 5 & n.2 (estimating the aggregate "face value" of the Voucher Program at $265 million, and estimating "the aggregate monetary value" of the Voucher Program at $205 million).)[5]

·On September 12, 2005, the Court directed Plaintiffs and Defendants to submit *separate* sworn declarations detailing the monetary value, if any, to the Class of the structural changes described in the [Court's July 30, 2004] Decision."[6] (Or-

---

4. The expense reductions included $204,975.39 that Class Counsel had earlier accepted pursuant to the Objector Settlement, dated July 1, 2004. (See page 382–83, supra; Objector Settlement, ¶ 2; Declaration of Stanley Chesley, dated July 8, 2004 ("Chesley 7/8/04 Decl."), ¶ 15.)

5. Dr. Rosen is described by Plaintiffs as "an economist with extensive experience in reviewing and evaluating businesses and economic and financial data." (Rosen Aff. ¶ 1.)

He has a Ph.D. degree from Case Western Reserve University. (Id.)

6. The Structural Changes include: "(1) using licensed insurance brokers and independent claims adjusters to adjust claims; (2) reorganizing UPS's reinsurance program so that Overseas Partners Ltd. (which allegedly is a subsidiary of UPS) 'no longer reinsures the EV Insurance policies'; (3) notifications about the exclusion from coverage of articles of unusual value; (4) notice that the price of

der, dated Sept. 12, 2005.) On September 26, 2005, Plaintiffs submitted a declaration of Dr. Rosen, who "conclud[ed] to a reasonable degree of economic certainty that a conservative range of the value of the structural changes is between $79.8 million and $142.4 million...." (Declaration of Harvey S. Rosen, dated Sept. 26, 2005, ¶ 8.)[7] Defendants submitted the declaration of their counsel, Steven M. Kaufmann, that "Defendants are not in a position to assign a meaningful monetary value to the various disclosure and structural changes to the EV Insurance program under the Settlement." (Declaration of Steven M. Kaufmann, dated Sept. 26, 2005 ("Kaufmann Decl."), ¶ 2.) In a memorandum endorsement, dated September 26, 2005, the Court stated that "Defendants' submission is not convincing nor is it, respectfully, likely that Defendants are unable, *e.g.*, with the help of outside consultants if need be, to come up with a meaningful[ ] and documented valuation of the entire settlement—coupons plus 'structural changes.' " (Memorandum Endorsement, dated Sept. 26, 2005.) In response, on or about October 6, 2005, Defendants submitted a Supplemental Submission Regarding the Monetary Value of the Structural Changes Under the Settlement ("Defs' Supp. Submission") describing the value of the "primary 'structural changes' " as follows: First, as to the "changes . . . to the use of licensed insurance agents and independent claim adjusters to adjust claims," Defendants stated that "[w]hile the independence of these licensed professionals may provide intangible consumer protection, there is no evi-

dence that these measures resulted in more claims paid or 'the return of more premiums' to customers as plaintiffs suggest." (*Id.* at 2.) "In fact, the ratio of paid claims to premiums in this program was fairly constant from 1984–003," and "actually decreased slightly after the institution of the Settlement compliance measures...." (*Id.* (citing Declaration of Hathaway Jones, dated Oct. 5, 2005 ("Jones Decl."), ¶¶ 2–3).) Second, "UPS had stopped reinsuring the EV program with OPL [Defendants Overseas Partners, Ltd. and Overseas Partners Capital Corp.] and instead began reinsuring the program through a wholly owned subsidiary" (while "also put[ting] in place independent claims adjusters and us[ing] licensed insurance agents," Jones Decl. ¶ 4) "before this Settlement . . . and was a conservative move by UPS to eliminate the tax issue for future years." (Defs' Supp. Submission at 3 (citing Jones Decl. ¶ 3–4).) The "third structural change stipulated that UPS [make] additional disclosures related to EV Insurance concerning the exclusion from coverage of Articles of Unusual Value, that the price of EV Insurance is surcharged by Mail Boxes Etc., Inc. franchisees, and that the purchase of EV Insurance is optional." (*Id.*) Defendants commented that "[w]hile UPS believes that prior disclosures were adequate, the additional disclosures certainly also provide a broad and clear explanation," but that "UPS cannot ascribe a monetary value to those changes." (*Id.*)

**For the reasons set forth below, Class Counsel's Fee Application is granted in**

---

EV Insurance is surcharged by Mail Boxes Etc., Inc. franchisees; and (5) notice that the purchase of EV Insurance is optional." Settlement Order, 2004 WL 1724980, at *4 (citing Settlement § V(C)). In their recent submission estimating the value of the Structural Changes, Defendants limited their analysis to

"three primary" structural changes aggregating (3) through (5). (*See* pages 384–85, *infra.*)

7. This contrasted with Dr. Rosen's earlier statements that he could not "quantify the precise economic value" of the Structural Changes. (Rosen Aff. ¶ 9.)

part and denied in part; the application for an award of Incentive Compensation to the Class Representatives is denied; Class Counsel's Objections to Judge Fox's Report are denied (as explained below); and Objectors' Counsel's Fee Applications and motion for incentive compensation are denied. The Court awards Class Counsel $2,407,294 in legal fees and $753,144.25 in expenses.[8]

## II. Legal Standard

"The trend in this Circuit is toward the percentage method, which directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 123 (2d Cir.2005), *cert. denied,* 544 U.S. 1044, 125 S.Ct. 2277, 161 L.Ed.2d 1080 (2005). "[T]he lodestar remains useful as a baseline even if the percentage method is eventually chosen"; where the lodestar is "used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized." *Goldberger v. Integrated Resources, Inc.,* 209 F.3d 43, 50 (2d Cir. 2000). "[N]o matter which method is chosen, district courts should continue to be guided by the traditional criteria in deter-

mining a reasonable common fund fee, including: '(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.' " *Id.* (citation omitted). The party seeking attorneys' fees bears the "burden of establishing entitlement to an award. . . .' " *Savoie v. Merchants Bank,* 166 F.3d 456, 463 (2d Cir.1999) (citation omitted).[9]

## III. Analysis

### A. Class Counsel's Fee Application
#### 1. Legal Fees

Class Counsel sought a total award of $19,340,000.00 ($18,478,571.70 in legal fees and $861,428.30 in expenses) to be paid by UPS and shared among up to 42 sets of Plaintiffs' counsel (and including up to $600,000 in Objectors' Counsel's fees and expenses). (Pl. Fee Mem. at 1; Objector Settlement ¶ 4; Report.)[10] Class Counsel initially argued that "[t]his settlement presents an ideal case for using the percentage of the common benefit as the basis for determining an award of fees." (Pl. Fee Mem. at 6; *see id.* ("Courts in the

---

8. The legal fee award equates to approximately 30% of the value of the total settlement, as explained below.

9. The Court has a duty to scrutinize counsel's fees regardless of the fact that such fees will be separately paid by defendants. *See Staton v. Boeing Co.,* 327 F.3d 938, 964 (9th Cir. 2003) ("That the defendant in form agrees to pay the fees independently of any monetary award or injunctive relief provided to the class in the agreement does not detract from the need carefully to scrutinize the fee award."); *In re Compact Disc Minimum Advertised Price Antitrust Litig.,* 370 F.Supp.2d 320, 321–23 (D.Me.2005); *see also In re Sterling Foster & Co., Inc., Sec. Litig.,* 238 F.Supp.2d 480, 490 (E.D.N.Y.2002) (citation omitted).

10. Class Counsel's initial $19,340,000.00 request did not distinguish between fees and expenses. (PL Fee Mem. at 1.) On May 6, 2004, Class Counsel documented $1,066,403 in expenses (*see* Attachment to Chesley 5/6/04 Decl.), which, when subtracted from $19,340,000.00 would yield a legal fee request of $18,273,597. On July 8, 2004, Class Counsel reduced their expense request by $204,975.39. (Chesley 7/8/04 Decl. ¶ 15.) On December 16, 2004, Class Counsel sought a $6,944,964 lodestar and a 2.7 multiplier (Class Counsel Response to R & R at 7 n.14, 9), which would yield legal fees of $18,751,402.

Second Circuit recognize that the preferred approach to awarding fees and the reimbursement of expenses when Counsel's efforts have created a common benefit is the percentage of the value of the benefit.").) Under this approach, the "requested fees [of $18,478,571.70] represent less than 10% of the value of the Settlement," *i.e.*, which Class Counsel estimated in 2004 to be over $205 million. (Pl. Fee Mem. at 1, 10; *see* Transcript of May 21, 2004 Fairness Hearing at 59–60; Rosen Aff. ¶¶ 5, 8–9.) As it happens, the requested fees are approximately 280% greater than the $4,863,877 actual value of the redeemed coupons. (*See* Joint Report ¶ 4.)

In December 1994, Class Counsel stated that "[i]n light of this Court's adoption of the view that a percentage of the fund cannot be awarded in a settlement that provides in kind benefits [coupons] until the number of class members who choose to take advantage of the benefits is actually known, ... Plaintiffs request that the ... Court calculate the fee using only the lodestar approach, and consider the appropriate factors in assessing the multiplier to be provided." (*See* Class Counsel Response to R & R at 5–9.) As noted, Class Counsel sought a $6,944,964 lodestar (*see* Attachment to Chesley 5/6/04 Decl.) and suggested a 2.7 multiplier (Class Counsel Response to R & R at 7 n.14, 9), which would yield legal fees of $18,751,402. (*See* page 385 n. 10, *supra.*) Class Counsel also argued that the "law does not require the Court to base the fee award on the redeemed vouchers." (Plaintiffs' Response to Objections to the Award of Attorneys' Fees, dated May 6, 2004 ("Pl. Opp. Mem."), at 21–22.)

■ The Court finds that the percentage method of calculating legal fees, rather than the lodestar, is appropriate in this case.[11] *See Wal–Mart*, 396 F.3d at 123 ("The trend in this Circuit is toward the percentage method...."); *In re Compact Disc*, 370 F.Supp.2d at 322 ("the percentage of fund method is the prevailing approach for a common fund case like this, subject to check by the lodestar approach"). The lodestar approach is not appropriate (especially if enhanced by a multiplier as Class Counsel suggest) where, as here, the lodestar substantially exceeds the value to the class of the coupons redeemed, *e.g.*, $6,944,964.00 (lodestar) versus $4,863,877 (coupons redeemed). *See, e.g., Strougo v. Bassini*, 258 F.Supp.2d 254, 262–63 (S.D.N.Y.2003) (employing percentage approach where lodestar exceeded settlement value); Fed. R.Civ.P. 23(h) Adv. Comm. Note (In determining counsel's fees, "[o]ne fundamental focus is the result actually achieved for class members....").

The "[d]etermination of an appropriate fee award starts with assessing a percentage against the amount recovered." *Compact Disc*, 370 F.Supp.2d at 321. The total value of the Settlement ("Settlement Value") in this case consists of: (1) the value of the Voucher Program; (2) the value of injunctive relief ("Structural Changes"); and (3) total awarded legal fees and expenses. *See Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 245–46 (8th Cir.1996) ("The award to the class and the agreement on attorney fees represent a package deal. Even if the fees are paid directly to the attorneys, those fees are still best viewed as an aspect of the class' recovery."); *Manual for Complex Litigation*

---

11. Class Counsel's objections to Judge Fox's Report are, therefore, moot with respect to counsel's lodestar. *See Goldberger*, 209 F.3d at 50 (where the lodestar is "used as a mere cross-check, the hours documented by coun-sel need not be exhaustively scrutinized"). The Court considers *de novo* (below) Class Counsel's objections to the Report's findings regarding expenses. (*See* Section III.A.2, *infra.*)

§ 21.7, at 335 (4th ed. Fed. Jud. Center 2004) ("If an agreement is reached on the amount of a settlement fund and a separate amount for attorney fees and expenses ... the sum of the two amounts ordinarily should be treated as a settlement fund for the benefit of the class.... The total fund could be used to measure whether the portion allocated to the class and to attorney fees is reasonable.").

The value of the Voucher Program consists of the total dollar value of redeemed vouchers or $4,863,877, which is 2.4% of Plaintiffs' original estimate of voucher redemptions, *i.e.*, $205 million. *See Compact Disc*, 370 F.Supp.2d at 321 ("the actual realized value of the vouchers" consisted of vouchers actually redeemed by class members); *see also* Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4, § 3(a), codified at 28 U.S.C. § 1712 ("If a proposed settlement in a class action provides for a recovery of coupons to a class member, the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed.").[12]

The value of the Structural Changes is more difficult to quantify. Until the Court's recent request, neither party had, in fact, assigned a monetary value to the Structural Changes. Plaintiffs' expert had initially stated that, although the Structural Changes had "very substantial" value, he could not "quantify the precise economic value" (Rosen Aff. ¶ 9), and Defendants

have consistently taken the position that they were "not in a position to assign a meaningful monetary value" to the Structural Changes (Kaufmann Decl. ¶ 2).

> Precisely because the value of injunctive relief is difficult to quantify, its value is also easily manipulable.... We hold, therefore, that only in the unusual instance where the value to individual class members of benefits deriving from injunctive relief can be accurately ascertained may courts include such relief as part of the value of a common fund for purposes of applying the percentage method of determining fees. When this is not the case, courts should consider the value of the injunctive relief obtained as a "relevant circumstance" in determining what percentage of the common fund class counsel should receive as attorneys' fees, rather than as part of the fund itself.

*Staton*, 327 F.3d at 974 (citations omitted); *accord Linney v. Cellular Alaska Partnership*, 1997 WL 450064, at *6-7 (N.D.Cal. July 18, 1997) (Where class action settlement consisted of $6 million cash recovery plus "injunctive relief with a value, although no doubt substantial, that can only be estimated," and which class counsel's expert valued at between $20.9 million and $34.2 million, court granted legal fees of $2 million, or one-third of the cash recovery. "Therefore, even if one argues that the injunctive relief provided for in the settlement is worthless, a proposition the Court and the parties sincerely doubt, class coun-

---

12. *See In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 292 F.Supp.2d 184, 189-90 (D.Me.2003) (deferring "award of attorney fees until experience shows how many vouchers are exercised and thus how valuable the settlement really is"); *Manual for Complex Litigation*, § 14.121, at 190 ("[C]ourts can award fees as a percentage of coupons actually redeemed by class members. Where payment of a common benefit is scheduled to take place in the future, consider linking the

attorney-fee award to that future payment.") (footnote omitted); *id.* § 21.71, at 336-37 (Fees maybe deferred and made "contingent on the value of in-kind benefits that are actually delivered to the class members." Because "fee awards should be based only on the benefits actually delivered ... [i]t is common to delay a final assessment of the fee award and to withhold all or a substantial part of the fee until the distribution process is complete.").

sel will receive no more than one-third of the relief obtained for the class."), *aff'd* 151 F.3d 1234 (9th Cir.1998).

The Court has considered the opinion of Plaintiffs' expert, Dr. Rosen, who "conservatively" estimates the value of the Structural Changes at $79.8 million to $142.4 million. Respectfully, Dr. Rosen's perspective is not persuasive because, among other things, he (vastly) overestimated the value of the Voucher Program, *i.e.*, by over 4,000%. (Rosen Aff. ¶¶ 5, 8–9.) While the Structural Changes may "confer a substantial benefit upon the Class," Settlement Order, 2004 WL 1724980, at *14, they were not, insofar as the record shows, considered to be worth (much less exceed) the value of the Voucher Program (*id.*). The Court is mindful of Defendants' evaluation of (some of) the Structural Changes, for example, that there is little evidence that UPS customers benefitted from the "changes … to the use of licensed insurance agents and independent claim adjusters to adjust claims," and that, for tax purposes, UPS had already "stopped reinsuring the EV program with OPL" prior to the Settlement. (*See* pages 384–85, *supra* (quoting Defs' Supp. Submission and Jones Decl.).)[13] Defendants also commented that "[w]hile UPS believes that prior dis-

closures were adequate, the additional [Structural Change] disclosures certainly also provide a broad and clear explanation," but that "UPS cannot ascribe a monetary value to those changes." (*Id.*) Rather than attempt to assign a specific dollar value to the Structural Changes, the Court is acknowledging that they do benefit the Class by awarding legal fees at the upper end (30%) of the Settlement Value commonly awarded under the percentage method, although still substantially lower than the fees sought by counsel. *See Staton*, 327 F.3d at 974 (citations omitted) ("courts should consider the value of the injunctive relief obtained as a 'relevant circumstance' in determining what percentage of the common fund class counsel should receive as attorneys' fees"); *accord Linney*, 1997 WL 450064, at *6–7.[14]

In determining the appropriate legal fee award, the Court has also reviewed the factors set forth in *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir.2000), as follows: First, the Court concludes that Class Counsel expended substantial time and labor, as evidenced by, among other things, Class Counsel's lodestar records. As the same time, the Case Management Order, dated July 7, 2000, did not provide that up to 42 sets of coun-

13. "[T]he value of the injunction differs enormously depending on whether it is considered from the viewpoint of the plaintiffs or defendants." *Kings Choice Neckwear, Inc. v. DHL Airways, Inc.*, No. 02 Civ. 9580, 2003 WL 22283814, at *4 (S.D.N.Y. Oct. 2, 2003); *accord Charles v. Goodyear Tire & Rubber Co.*, 976 F.Supp. 321, 325 (D.N.J.1997).

14. " '[T]he fact that any reasonable fee would necessarily represent a negative multiplier of the lodestar supports an award at the higher end of the spectrum.' " *In re Sterling Foster & Co., Inc., Sec. Litig.*, 238 F.Supp.2d 480, 486–90 (E.D.N.Y.2002) (where counsel claimed a lodestar of over $1.6 million, awarding fee of $550,000, or 25% of $2.2 million settlement); *accord Strougo*, 258 F.Supp.2d at 262–63 (where lodestar was

nearly $1.8 million, awarding fee of $500,000, or 33.3% of $1.5 settlement); *In re Blech Sec. Litig.*, No. 94 Civ. 7696, 2002 WL 31720381, at *1 (S.D.N.Y. Dec. 4, 2002) (where lodestar was $5.4 million, awarding fee of $919,666.67, or 33.3% of $2,759,000 settlement, although "counsel reserve[d] their right to seek recovery against the non-settling defendants"); *Baffa v. Donaldson Lufkin & Jenrette Sec. Corp.*, 96 Civ. 0583, 2002 WL 1315603 (S.D.N.Y. June 17, 2002) (where lodestar was $2.4 million, awarding fee of $900,000, or 30% of $3 million settlement); *see also Compact Disc*, 370 F.Supp.2d at 321–23 (where lodestar was $1,527,660, awarding fee of $451,500, or 17.8% of $2,530,000 settlement, although the court calculated the fee as 30% of the $1,505,000 in vouchers actually redeemed by the class).

sel would submit (substantial) legal bills in this case.[15] (*See* Case Management Order, dated July 7, 2000 ("Case Management Order"), at 4–10 (approving three lead counsel and directing Class Counsel to "coordinate the prosecution of these cases so [as] to avoid unnecessary fees and expenses, strain upon judicial and the parties' resources and duplication of effort," and assigning specific duties to Lead Counsel, including "[e]nsur[ing] that time and expenses are being spent appropriately").)[16] *See also In re Elan Secs. Litig.*, 385 F.Supp.2d 363, 374 (S.D.N.Y.2005) ("the Court has paid particular attention to Unappointed Counsel's lodestar because, among other reasons, Unappointed Counsel were not selected by the Court to play a role in this case ..."). As to the second factor, "[t]his four-year old action is legally and factually complex as it involves, among other things, contract, RICO, and antitrust claims filed in 27 different state and federal cases on behalf of over 2.6 million Plaintiffs against 27 named Defendants." Settlement Order, 2004 WL 1724980, at *11. As to the third *Goldberger* factor, *i.e.*, the risk of the litigation, this case did not

appear exceptionally risky, particularly at the time it was commenced. *See Goldberger*, 209 F.3d at 54–55 (the risk to counsel "must be measured as of when the case is filed"); *accord In re Bristol–Myers Squibb Secs. Litig.*, 361 F.Supp.2d 229, 234 (S.D.N.Y.2005). That is, at the time virtually all of the consolidated cases were filed in 1999 and 2000, there had been a ruling very favorable to Plaintiffs by the United States Tax Court (the "Tax Court Ruling"). *See UPS of America, Inc. v. Commissioner*, No. 15993–95, 1999 WL 592696 (U.S.Tax Ct. Aug. 9, 1999) ("With respect to the restructuring of the excess value income, we have found that petitioner engaged in ongoing sham transactions devoid of economic substance during the year at issue."). While this case was pending, the Tax Court Ruling was reversed, on June 20, 2001, by the United States Court of Appeals for the Eleventh Circuit. *UPS of Am., Inc. v. Commissioner*, 254 F.3d 1014, 1020 (11th Cir.2001); *see* Settlement Order, 2004 WL 1724980, at *1, 12 ("the Eleventh Circuit's reversal of the Tax Court Ruling took a considerable 'bite' out of Plaintiffs' case").[17] "The quality of rep-

---

**15.** Indeed, at the very outset of the case, at the June 23, 2000 conference regarding the Case Management Order, the Court expressed concern (and placed counsel on notice) regarding the number of attorneys involved and the amount of legal fees. (*See* Transcript of Conference, dated June 23, 2000, at 4–10 ("I guess my first question is, is this usual and why do we need so many attorneys as lead counsel?" "[W]hat about legal fees ... ?" "I wanted to signal early on that it's a concern that I have, and I think that's been accomplished.").)

**16.** Under the Case Management Order and subsequent orders, the Court appointed no more than three Lead Counsel, one liaison counsel, and two counsel to represent certain subclasses. (*See* Case Management Order at 4–10; First Amendment to Case Management Order, dated Feb. 2, 2001; Stipulation and Order Regarding Class Certification, dated Nov. 12, 2002 ("Class Certification Order"), at 7, 15.) The Case Management Order also

"acknowledges" that six attorneys have "agreed among themselves to serve as Plaintiffs' EVIC Steering Committee." (Case Management Order at 6; *see also* Class Certification Order at 15 (acknowledging designation of seventh attorney to the Steering Committee).)

**17.** Other developments that may have heightened the risk to Plaintiffs but which took place well after the case was filed included: (1) the Court's July 30, 2002 Decisions and Orders which "foreclosed several of Plaintiffs' claims," Settlement Order, 2004 WL 1724980, at *12, and (2) the United States Supreme Court's January 2004 decision in *Verizon Communications Inc. v. Law Offices of Curtis*, 540 U.S. 398, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004), which " 'narrow[ed] the scope of the essential facilities doctrine'... thereby, possibly weakening Plaintiffs' antitrust claims," Settlement Order, 2004 WL 1724980, at *12 n. 18.

resentation," *i.e.*, the fourth *Goldberger* factor, was, in the Court's opinion, certainly acceptable.

The fifth and sixth *Goldberger* factors— "the requested fee in relation to the settlement" and "public policy considerations"— support (indeed, compel) a fee award significantly lower than the $19,340,000 million sought by Class Counsel. As noted, the value of the vouchers redeemed is only $4,863,877 in comparison to the $205 million predicted by Class Counsel. And, the value of the Structural Changes is difficult to quantify. It would be anomalous and unacceptable for counsel to fare better than the Class, for example to receive 280% more than the Class actually received, as Class Counsel suggest. While "this case is undoubtedly a losing proposition for [Class Counsel]," the settlement value ultimately "was very modest." *Compact Disc*, 370 F.Supp.2d at 323 (awarding fee of less than 18% of total settlement value because voucher redemptions proved to be much lower than predicted); *see, e.g., In re Auction Houses Antitrust Litig.*, No. 00 Civ. 0648, 2001 WL 170792, at *9 (S.D.N.Y. Feb. 22, 2001), *aff'd*, 42 Fed. Appx. 511 (2d Cir.2002); *see also* Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4, § 2(a)(3) ("Class members often receive little or no benefit from class actions, and are sometimes harmed, such as where ... counsel are awarded large fees, while leaving class members with coupons or other awards of little or no value....").

## 2. Expenses

■ Class Counsel initially requested $1,066,403 in expenses (*see* Attachment to Chesley 5/6/04 Decl.) and, thereafter, reduced their expense request by $204,975.39 (Chesley 7/8/04 Decl. ¶ 15; Objector Set-tlement ¶ 2; Report at 5–6), apparently resulting in a final expense request of $861,428.30 (*see* page 385, *supra*). Judge Fox recommended that Class Counsel's expense award be set at $753,144.25 based upon, among other things, the following guiding principles: "fee applications that do not contain [sufficient] supporting data" or that contain "vague" descriptions should normally be disallowed (Report at 11); expenses will be limited to "$500 per round-trip flight," $100 per day for meals and $200 per night for lodging, and $0.25 per facsimile page (*id.* at 11–12); and expenses relating to duplicative staffing will be disallowed (*id.* at 10, 42, 44). (*See also* Case Management Order at 4–10.)

Plaintiffs filed objections to the Magistrate Judge's Report arguing that, among other things: Judge Fox's "knowledge of the case was limited" and that he "neither asked for additional information nor conducted any hearings" (Class Counsel Response to R & R at 2–4); the "blanket reductions for travel and additional attorney participation are unusually harsh" (*id.* at 4–5); and Judge Fox erred regarding a variety of individual expense requests (*id.* at Exs. A–C, E–H).

Having conducted a *de novo* review of Class Counsel's expenses, including the Report, objections to the Report, the record, and applicable legal authorities, the Court finds that the legal and factual determinations made by Judge Fox regarding Class Counsel's expenses are supported by the record and the law. *See Pizarro v. Bartlett*, 776 F.Supp. 815, 817 (S.D.N.Y.1991).[18] First, the Court appointed three Lead Counsel on July 7, 2000, one liaison counsel on February 2, 2001, and two counsel to represent certain

---

**18.** As to any portion of the Report to which no objections have been made, the Court concludes that the Report is not clearly erroneous. *See Pizarro*, 776 F.Supp. at 817. Any

Objections concerning expenses not specifically addressed in this Order have been considered *de novo* and rejected.

subclasses on November 12, 2002. The Case Management Order (and later orders) "acknowledged" that seven attorneys have "agreed among themselves to serve as Plaintiffs' EVIC Steering Committee." (*See* page 389 n. 16, *supra.*) Second, Judge Fox's decision to reduce vague or insufficiently itemized expenses was entirely appropriate. (*See, e.g.,* Report at 49 (rejecting $19,291.05 in unitemized expenses requested by Milberg, Weiss, Bershad & Shulman, L.L.P. relating to "Expert/Consultants Fees," "Travel/ Meals," and "Secretary/Support Staff Disbursements").) It was Class Counsel's burden to establish entitlement to fees, *Savoie*, 166 F.3d at 463; it was not Judge Fox's burden to fill gaps in Class Counsel's application. *See Hynes v. Squillace*, 143 F.3d 653, 656 (2d Cir.1998) ("Considerations of efficiency and fairness militate in favor of a full evidentiary submission for the Magistrate Judge's consideration, and we have upheld the exercise of the district court's discretion in refusing to allow supplementation of the record upon the district court's *de novo* review."); *see also Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 354 (S.D.N.Y.2005) ("a failure to itemize the reasons for substantial expenditures is grounds for a reduction in the amount of an expense award") (citation omitted). Nor are Judge Fox's reductions for excessive travel expenses (Report at *11–12) "unusually harsh" (Class Counsel Response to R & R at 4–5). *See, e.g., Mark Andrew of the Palm Beaches, Ltd. v. GMAC Commercial Mortg. Corp.*, No. 01 Civ. 1812, 2003 WL 21767633, at *2 (S.D.N.Y. July 31, 2003) (applying similar limitations). Judge Fox reasonably reduced expenses relating to duplicative attorney participation, including Plaintiffs'

practice of sending multiple attorneys to court conferences (Report at 42, 44). *See, e.g., Anderson v. Rochester–Genesee Regional Transp. Auth.*, 388 F.Supp.2d 159, 165 (W.D.N.Y.2005) (declining to "compensate all of plaintiffs' attorneys for those appearances when the use of just one or two lawyers would have been adequate").

### Fee and Expense Award

**Based upon the foregoing considerations, the Court concludes that the Settlement Value of this case is $8,024,315. It awards Class Counsel legal fees amounting to $2,407,294, or approximately 30% of the Settlement Value. In addition, the Court awards Class Counsel $753,144.25 in expenses.[19]**

### B. Class Representatives' Incentive Payment

■ Class Counsel seeks an award of Incentive Compensation in the amount of $5,000 for each of the 32 Class Representatives, for a total of $160,000. (Pl. Fee Mem. at 1.) Plaintiffs concede that the "Notice [of Settlement] does not disclose the incentive awards," but argue that this "oversight by the parties . . . should not inure to the detriment of the Class Representatives . . . ." (Pl. Opp. Mem. at 20.)

Rule 23(h) of the Federal Rules of Civil Procedure provides that notice of fee applications "must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner." Fed.R.Civ.P. 23(h) (effective Dec. 1, 2003). Rule 23.1 of the Local Civil Rules of the United States District Court for the Southern District of New York provides:

Fees in Stockholder and Class Actions

---

**19.** The Settlement Value includes awarded legal fees and expenses because even where, as here, "attorneys' fees are borne by defendants and not plaintiffs, . . . the attorneys' fees nonetheless are a valuable part of the settle-

ment and thus fairly characterized as part of the common fund." *In re Vitamins Antitrust Litig.*, No. 99–197, MDL 1285, 2001 WL 34312839, at *9 (D.D.C. July 16, 2001); *accord Johnston*, 83 F.3d at 245–46.

Fees for attorneys or others shall not be paid upon recovery or compromise in a ... class action ... except as allowed by the court after a hearing upon such notice as the court may direct. The notice shall include a statement of the names and addresses of the applicants for such fees and the amounts requested respectively and shall disclose any fee sharing agreements with anyone.... Where the court directs notice of a hearing upon a proposed ... settlement of a ... class action, the above information as to the applications shall be included in the notice.

S.D.N.Y. Civ. R. 23.1. Neither the "Long Form" nor the "Short Form" Settlement Notice to the Class contained any mention of the proposed Incentive Compensation. Both Fed.R.Civ.P. 23(h) and Local Civil Rule 23.1 specifically provide that the Class be given notice of all fee applications. *See* Fed.R.Civ.P. 23(h) Advisory Committee Notes to the 2003 Amendments.

Moreover, the actual coupon redemption results (which, as noted, were 2.4% of original estimates) does not justify separate cash awards to the 32 Class Representatives. *See Cook v. Niedert,* 142 F.3d 1004, 1016 (7th Cir.1998) (in determining incentive award, relevant factors include, among other things, "the degree to which the class has benefitted from [the class representatives'] actions"). Accordingly, Plain-

tiffs' motion for an award of Incentive Compensation to the Class Representatives is respectfully denied.

### C. *Objectors Counsels' Fee Applications*

■ Pursuant to the Objector Settlement, counsel for Objector Stainless Systems filed an application on July 5, 2004 for an award of $183,100 in attorneys' fees and 52,084.27 in costs (Stainless Fee Mem. at 1–3 ("Counsel for Stainless Systems has benefitted the Class by obtaining significant and beneficial changes to the Settlement")), and counsel for the Coordinated Objectors filed an application on July 9, 2004 for an award of attorneys' fees and expenses in the amount of 5500,000, from which the Coordinated Objectors seek to be paid an "incentive award" of $1,000 (Coord. Obj. Fee Mem. at 3, 8 (the Coordinated Objectors "flagged a serious defect in the calculation of relief to class members with different levels of damages that the parties had entirely overlooked")).[20] The Objectors' Fee Applications are unopposed, aside from the Coordinated Objectors' argument, on July 9, 2004, that Stainless Systems' counsel's fee should be limited to $100,000. (*See also* Chalmers Declaration and Supplemental Memorandum, dated December 13, 2004; Chalmers Declaration, dated January 12, 2005; Application by Counsel for Stainless Systems for Payment of Costs, filed April 5, 2005.)

**20.** The modifications to the Voucher Program included the following:

(1) where a Class Member "would receive a larger Voucher if [he] claimed a smaller amount of Excess Value Premiums," "the Settlement Administrator will treat the eligible Settlement Class Member as having paid a lower amount of Excess Value Premiums so that a higher rate and amount of recovery will apply"; (2) an "Automatic Voucher issued to a UPS Account that is no longer open and active may be redeemed

through a new or existing open and active UPS account issued to the same person"; [and] (3) if a Class Member's claim is denied by the Settlement Administrator, the Class Member may contact Class Counsel who "will assist the Settlement Class Member if the denial ... should be reconsidered...."

Settlement Order, 2004 WL 1724980, at *8 (quoting Objector Settlement ¶ 1); *see* Fourth Addendum to the Settlement.

Objectors' Counsel are seeking fees and expenses amounting to approximately 8.5% of the value of the Settlement and 14.1% of the value of the coupons actually redeemed by Class Members. While Objectors' counsel may, in some circumstances, be entitled to attorneys' fees and expenses "where a proper showing has been made that the settlement was improved as a result of their efforts," *White v. Auerbach*, 500 F.2d 822, 828 (2d Cir.1974); *accord In re Elan.*, 385 F.Supp.2d at 376–77; *In re Independent Energy Holdings PLC Secs. Litig.*, No. 00 Civ. 6689, 2003 WL 22801724, at *1 (S.D.N.Y. Nov. 24, 2003), such an award here seems ill-advised because the Class received relatively little Settlement Value and Objectors' efforts have not been shown appreciably to have benefitted the Class, *see In re Anchor Secs. Litig.*, No. 88 Civ. 3024, 1991 WL 53651, at *1–2 (E.D.N.Y. Apr. 8, 1991) (denying fees to objectors' counsel because they "did not assist [the court] in framing the issues for the settlement, ... 'enhance' or 'improve' the recovery itself or its structure," or "affect[ ] the outcome as to fees"). While Defendants agreed to a number of modifications to the Voucher Program and Class Counsel agreed to reduce their application for expenses by $204,975.39 as part of the Objector Settlement, *see* Settlement Order, 2004 WL 1724980, at *8, the Objectors offer little or no evidence that these modifications materially benefitted the Class in terms of dollars and cents, *see Savoie*, 166 F.3d at 463.[21] Fundamentally, the Court needed little or no assistance from the Objectors in determining that Class Counsel's Fee Application should be

(i) deferred pending the results of the Voucher Program, and (ii) tailored to the actual benefit received by the Class. *See, e.g., Anchor*, 1991 WL 53651, at *2 ("Prevailing case law in this area of which this Court was well aware determined that they were not entitled to it."); *see also* Settlement Order, 2004 WL 1724980, at *16 (deferring consideration of Class Counsel's Fee Application because "the Settlement's actual value to the Class is unclear and cannot accurately be assessed until the rate at which Class Members redeem UPS Vouchers is known").

## IV. Conclusion and Order

For the foregoing reasons, Class Counsel's Fee Application [142] is granted in part and denied in part, the motion for an award of Incentive Compensation to the Class Representatives [142] is denied, the Objectors' Counsel's Fee Applications and motion for incentive compensation for Objectors [196 and 200] are denied, and Class Counsel's Objections [215] to Judge Fox's Report and Recommendation are denied.

---

**21.** Judge Fox's thorough and detailed Report recommended an additional $108,284.05 expense reduction beyond the $204,975.39 in stipulated expense cuts; and $186,584.23 of the $204,975.39 stipulated expense cuts involved unspent "litigation fund" contributions that were readily detectable. (*See* Report at 12–13 (analyzing $186,584.23 litigation fund expenses).) Objectors' suggested cuts in Class Counsel's lodestar did not affect the outcome, as noted, because the lodestar exceeds the value of the coupons redeemed and is not the measure of assessing fees being employed by the Court. (*See* page 386 n. 11, *supra*.)